The first case on the call of the docket is Agenda No. 7, Case No. 132066, Geller v. Uber Technologies. Mr. Pelt, are you prepared to proceed? Yes. Please proceed with your argument, Counsel. May it please the Court, Counsel. Good morning. My name is Chuck Haskins, and I have the privilege of representing, along with my partner Sarah King, the estate of Mark Geller, with Sheridan Geller as its administrator. Your Honors, countless Illinois citizens have an Uber app, or at some point have signed up for an Uber app, which means they have clicked terms of use that we are here to talk about today. But that also means, under the appellate court's ruling in this case, that unbeknownst to those citizens, they have given up their right to walk into an Illinois court and seek justice for a loved one, a husband, a wife, a child, a parent, a sister, or a brother, if God forbid they should be killed in a crash with an Uber driver. And how did we get here? Simply put, the appellate court got this one wrong. The appellate court first misapplied the Illinois Wrongful Death Act by finding that Sheridan was an individual plaintiff, which she is not. The Illinois appellate court misinterpreted this decision's binding decision in court. And finally, the Illinois appellate court violated the FAA, Henry Schein, and all cases dealing with arbitration clauses when they applied a delegation clause in Sheridan's terms of use without first answering whether there was ever a valid contract within which this controversy arose, which is language that specifically comes from Section 2 of the FAA. A valid contract and a controversy arising out of that contract. The appellate court made no determination as to that threshold question, which has specifically, legislatively, congressionally, been left only to courts. Counsel, would you indicate for us your understanding of opposing counsel's position as far as what Uber contract applies in this matter? Yes, thank you for the question, because when this case started, Uber filed a motion to dismiss, and they filed a motion to dismiss attacking Mark Geller's terms of use. There was one sentence in that entire motion that said, to the extent it may be relevant, Sheridan Geller also had her own terms of use. And that's what we responded to. In the reply, everything changed. The reply had nothing to do with Mark's use, but Sheridan's terms of use and Sheridan's delegation clause. And they had to do that, because after filing a motion with regard to Mark's use, it was very clear that Carter finds that the estate of Mark Geller is not a party to Mark's terms of use. And therefore, the only way that they could attack this claim to get it to arbitration was to say that it was Sheridan's use, Sheridan's terms of use. But furthermore, going back to where I just was, they also had to say that Sheridan was the plaintiff individually, which she is not. So your argument is this case didn't arise out of Sheridan's contract? A hundred percent. The terms of use which I claim to get to, which are written by Uber, the terms of use tell the court and the parties what is encompassed in those terms of use. The terms of use say this governs your relationship with Uber individually. And Section 2 of the FAA says it must arise out of that contract. Yes, that language is specifically in Section 2 of the FAA. Section 3 of the FAA gives courts the power, see courts have no power to stay on litigation and compel arbitration, short of the FAA giving them that power. Section 3 says that the court may stay litigation, but only when they are satisfied that Section 2 has been complied with or been met, which is a valid contract and a controversy arising out of that contract. Section 4 does the same thing, so 3 gives you the power to stay litigation, 4 gives you the power to court, the power to compel arbitration. Let me ask you, Sheridan has a contract, has the app on her phone, it's an Uber app, so hypothetically if she didn't have the app, say she didn't have it at all, and her husband was killed in fact, we wouldn't be here, is that your position? That's absolutely correct. So the fact that by happenstance she happens to have the Uber app, although this whole scenario didn't arise out of her use, that's the whole reason that we're here, right? That's absolutely correct. Say she had a Lyft app or a Curb app or something, we wouldn't be here? That's absolutely correct. Thank you. And that is absolutely what the Illinois court has already found in a case called Peterson, which was a case dealing with Airbnb. That came out of the first district, it's never been criticized, and in fact it's been cited throughout the country. This is all post-Henry Schein. So does Henry Schein control it all in this case? Henry Schein absolutely is Supreme Court precedent, and I will get to this, but the interesting part about Henry Schein is looking at the outcome of Henry Schein. Uber wants this court, and the appellate court found that under Henry Schein they were compelled to send this case to arbitration because of a delegation clause, because of language in Henry Schein. Henry Schein did not send that case to arbitration. It did not compel arbitration. The last paragraph in Henry Schein says, we do not, I don't want to get it wrong, but it basically says we do not decide whether or not there was a valid or a consent to arbitrate because the appellate court didn't decide that. We are sending this back down to the Fifth Circuit to decide that issue. So the very case that Uber is citing, and the appellate court relied on to say, well, there's a delegation clause, so the matter must go to arbitration, courts have no authority here, didn't find that. They didn't send the Henry Schein controversy to arbitration. They sent it back to the Fifth Circuit for further judicial evaluation of whether or not there was a valid agreement and a controversy arising out of it. So here your position is that the contract is not valid, therefore the court has to resolve that in the first instance. Is that right? It's twofold. Yes, we take the position that they have. And then following up on that, how is the contract not valid? Your Honor, we did discuss the concept of unconscionability throughout arbitration. Which is what the appellate court ruled on. Correct. They got to unconscionability. The next part where the appellate court didn't get to was did the controversy arise out of that contract? Is that a question of the validity of the contract or the application of the contract to the facts at issue here? It might be a flimsy argument that Uber is advancing, but isn't that something for the arbitrator to decide in the first instance under the delegation clause? Right, so very good question. So it is a question of validity within the FAA. See, the FAA gives the mandate of this two-prong approach. Was there a valid agreement and did the controversy arise out of that agreement? Justice, if you were just looking at a normal contract, the decision you have may be different. But the FAA specifically says that you need to go to that second part. As Congress said, did the controversy arise out of the contract itself? And that's where the appellate court, I agree they did look at unconscionability. We obviously disagree with their position on unconscionability. But they did not look at whether or not the controversy arose out of the contract. They said we are precluded from doing so, which they were not. Wasn't a similar issue raised in that Douglas v. Regents bank case, which the Henry Schein court specifically abrogated? A similar issue? The application, about the application. You're saying about the application of the wholly groundless exception? Well, I mean, there you had a situation where the plaintiff just by happenstance happened to also bank at the same bank that was sued and that invoked the arbitration clause. It's just like here. It's just happenstance that, I think it's Sharon. Is that her name? Sharon happened to have an Uber app as well. Sharon, I'm sorry. Sharon. No problem. So all those cases got abrogated for the sole reason that they implied the wholly groundless exception, which the FAA specifically did not write, or the Congress did not write in the FAA. Those words wholly groundless do not appear in the section one, two, three, or four of the FAA. So those cases were all abrogated insofar as they applied a wholly groundless exception, which was a judicially created exception, which the Supreme Court said is not, we can't write language into a statute when it's not there. That's not our job. But, so yes, there were a string of cases that were abrogated by Henry Schein, but only insofar as it got rid of the wholly groundless exception. Henry Schein, again, did not even send its own controversy to it. How do you draw the line between a wholly groundless claim and a claim regarding whether it arises out of the, where do you draw the line? So arising out of is a threshold that's been called by New Prime as an antecedent question to whether or not the court can even begin to discuss the contract as a whole. So Henry Schein, actually Henry Schein is a great example in and of itself, where in the terms of Henry Schein, there was a arbitration agreement with a delegation clause, and it specifically talked about that injunctive relief was not going to be a part of this larger agreement. That if somebody wanted to bring a case regarding injunctive relief, then they could do so in a court of law. Counsel, I can't help but wonder, are we starting at the right point? So this delegation issue, whether or not, you know, this should go to arbitration to decide if it should go to arbitration. And so with Schein, does that actually stand for the proposition you're suggesting? I mean, you mentioned that Schein basically, the only holding of Schein was that the wholly groundless exception did not exist and should not be considered. And so that dealt with when a contract delegates the arbitration question to an arbitrator, you can't use that wholly groundless term. So, I mean, does that really help you in terms of whether or not it needs to go to arbitration to decide whether or not it needs to go to arbitration? I'm so sorry, Your Honor. Can you repeat your question? I did not follow you at the end there. So I'm wondering, you know, we have a couple questions here. But the first question, I think, is whether or not there are terms in the contract, if it applies, that this has to go to arbitration to decide if this is an issue that should be arbitrated. I understand. So in Schein itself, right after the sentence that is quoted so often, which I'm sure you've seen, but that ship has sailed, talking about the preliminary inquiry into arbitrability, the court reiterates, to be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. And it cites 9 U.S.C. Section 2, which is that section that we've been talking about this morning. The Supreme Court post-Schein has referred to this dispute in Newprime as – in Newprime they had brought a – there was a delegation clause and there was a challenge based on Renner Center saying, wait, this can be severable and you can look at only the delegation clause. And Newprime said no. It said all of this overlooks the necessary antecedent statutory inquiry. Congress mandated a necessary, and the courts recognized the Supreme Court post-Schein, in Schein and post-Schein, recognizes the necessary antecedent statutory inquiry citing the Section 2 of the FAA. And that is a valid contract and a controversy arising under that contract or out of that contract. If we answer that no, case over. If you answer that no, this case, the trial court should be – We reverse. You should reverse the appellate court, affirm the trial court. It's very interesting when you look at the trial court's ruling in this case and what was reversed. The trial court first found that Sheridan's agreement did not have anything to do with – called it irrelevant to this dispute because it didn't – her terms deal with her use. Mark's death dealt with his use. The trial court actually did the necessary antecedent statutory inquiry and came to the right conclusion that Sheridan's agreement is invalid for this controversy because the controversy did not arise out of her contract. And when you're left with Mark's agreement, the state of Mark Geller is not a party to that agreement, and therefore the case should, under Carter, should proceed in the trial court. So that is exactly what we're asking the court to do. To reverse the appellate court and to reinstate or to affirm the trial court because they did the proper analysis and sent this case back to the trial court to continue. Which is exactly, by the way, what January Shine did. So did Shine hold that if there is a delegation clause, the court has no authority to decide the arbitrability question but instead must grant the motion to compel arbitration? If the antecedent statutory question is answered, yes, yes. If the antecedent statutory inquiry is answered, yes, that there's a valid contract and the controversy arose out of that contract, yes. And here there is absolutely no doubt that Sheridan's terms of use had anything to do with Mark's use of the app. Had anything to do with Mark ordering an app. A driver coming to pick him up, she wasn't there, she didn't use her app. Let me pose an extreme example. Let's say Uber was before the court saying that Sheridan has to arbitrate because she had a contract with Lyft. And our position is that that arbitration agreement that she had with Lyft applies to this dispute. Okay? Under Shine, must we send this back to, must we send this issue to the arbitrator to decide? So you're saying if... In other words, it's so wholly groundless, I mean, it's so flimsy that it would be a royal waste of time for anybody to have to, you know, look at this. But it's an argument that they raised. I'm raising this as an extreme example to find out where the line is. It's not that it's wholly groundless. It's remote from her contract. That is what all the cases post Shine talk about, is remote from her contract. There's no nexus between the controversy and her contract. I understand the confusion by the wholly groundless, but wholly groundless means you're into the contract. You've gotten past the antecedent statutory inquiry. You're into the contract, and now you're interpreting the contract itself. You can't get to a term of the contract until you arrive at a conclusion that there's a valid agreement that arises out of that contract. Wholly groundless in Shine, they got past the antecedent question because they didn't evaluate it, which is why it was sent back down the Fifth Circuit, and went straight to the carve-out for injunctive relief. And Shine said you can't do that. And the antecedent question here is whether it arises out of it. Is there a valid agreement, and does the controversy arise out of that controversy? Well, the valid agreement is the incontrovertibility issue, right? Among other state common law defenses, such as fraud, arrest, anything else? Have those defenses been raised here? No. Okay. I mean, I don't want to say. We do say that we give examples of when duress could lead to incontrovertibility because it's given on a take-it-or-leave basis, but no. Thanks for your question. Does the arbitrator have the power to determine that this should not be arbitrated? I mean, I keep going back to that question. So you're saying if you could an arbitrator decide that if you find that this case belongs in arbitration, they could? I mean, that might be the outcome. We don't know that. But that might be the outcome. The problem comes before that, which is delegation is just like arbitration is a matter of consent. Have these parties consented, clearly and unmistakably, that's the language, have these parties clearly and unmistakably consented to arbitrate or delegate, because delegation is merely a different form of arbitration clause, the threshold question or the question of arbitrability to an arbitrator, which is still post the antecedent statutory inquiry necessary. But that's the problem. Sheridan never consented. There's no interpretation of her terms of use, for it could ever be drawn that she consented to have the death of her husband for someone else's use of an app, a case against Uber, arbitrated. There's no consent. And that's what really arbitration is. Arbitration is a matter of contract, and it is a matter of consent, not coercion. Have the parties consented to arbitrate or delegate this issue? They have not here. Sheridan did not agree to this. Thank you. That short-circuited a lot of the second half of my argument. I do want to go back to the first error, which is the appellate court found that the wrongful death claim belongs to Sheridan individually, and she is the plaintiff on those claims. I see I'm running out of time. That's at page 40 of the appellate court, which they cite to Carter 33, which said actually that Sheridan is nothing more than a nominal party. I want to start by stating something obvious. If I brought this case as Sheridan-Geller individually versus Uber, it would have been dismissed. I see my time's up. Why don't you bring your argument to a conclusion, Mr. Haskins? The appellate court found that Sheridan was the individual plaintiff. What they did not explain is that as the administrator of the estate or as a beneficiary, and that has very bad consequences. Thank you, counsel. Thank you. Mr. Berlow? Good morning, Your Honors, and may it please the court. Clifford Berlow on behalf of Uber and Rezier. A plaintiff in her reply brief urges the court to resolve this case based upon principle, not precedent. Counsel? Yes. Let's start with the plaintiff. Let's assume that a contract and not fate determines arbitrability. How does Sheridan's agreement with Uber apply to the facts of this case? What's her contract with Uber got to do with the fact that Mark was killed following his use of the application? Explain the nexus for me. Certainly, Your Honor. And so let's just start with the terms of the agreement, the text of the agreement, which I think is- Which agreement are we talking about? There are two agreements, Mark's app and Sheridan's. Let's talk about Sheridan's. Yes. Let's talk about Sheridan's agreement because that's the one that would be applicable to the wrongful death action, obviously the survival action. And why? I'm trying to figure out the why. So the terms of use themselves say that it applies to all claims between you and Uber. So that starts, broadly speaking, defining the scope of arbitrability. But really what we're here about is the scope of the delegation clause. And unquestionably, the dispute about arbitrability, whether or not this particular claim arises out of this contract, arises out of the delegation clause. So the arbitrability issue arises out of this contract. So just take a look at the delegation language, which appears in- Arises out of which contract? Sheridan-Geller's contract. I think for purposes of this, where we are now, with the survival actions having been dismissed with prejudice, only the wrongful death claim is on the table. And so Mark Geller's agreement is no longer really a part of the case. That's the holding of Carter. The plaintiff voluntarily dismissed those claims so as not to arbitrate them. So we are just left with a single claim for wrongful death. Then you have the question of- So is it just by happenstance that she has to-she happens to have the Uber app, but the death of her husband is in no way related to the fact that she has an Uber app, but it still applies? I'm trying to-what is the nexus there? So the nexus is going to be from the terms of the agreement itself. I think-look at page 10 of Plaintiff's reply brief. So you're saying that the agreement means that even if her-if the claim arises out of something that had nothing to do with her activity with Uber, the Uber-the arbitration clause still applies? Whether-because I think we can all agree that this incident did not arise out of any activity between Sheridan and Uber. Is that correct? That's correct, Your Honor. So the arbitration clause applies anyway, even if it did not arise out of any activity between Sheridan and Uber. So Plaintiff-can I go back- Why would that be? Does that make sense to you? It certainly does, Your Honor. It's for the reason Plaintiff concedes at page 10 of her reply brief. Page 10 of her reply brief, I'll point out, Plaintiff acknowledges that this agreement could be written in a way to encompass the wrongful death claim. She acknowledges that. That's a concession that she made, and she must make that because of Federal Arbitration Act preemption. If the court were to adopt a rule that either directly or implicitly prohibited agreements to arbitrate claims for wrongful death, then that claim unquestionably would be presented. That's the Marmot Health Care Center case from the United States Supreme Court, which summarily reversed a decision from the West Virginia Supreme Court doing exactly that. So she concedes that you could write this agreement in a way that would encompass the claim for wrongful death. But what in this agreement, what is the language in this agreement that would do that? So that's- so, Your Honor, that gets really to my fundamental point here, which is the question here is not whether or not it is actually within the scope of the agreement, but whether or not it is a valid agreement. And I think that we believe we have a colloquial argument. I do want to directly answer your question and Your Honor's question. But the question is who decides. And it's- But isn't that only if after we answer, the court answers those threshold questions? First, whether or not there is a valid agreement, and whether the agreement encompasses the dispute. I mean, the FAA, these are- I mean, they don't obviate our responsibility to address those threshold questions, do they? Are you saying Schein does that? I'm saying that Rent-a-Senator against Jackson does that indeed, Your Honor. And so the section 2 argument that Plaintiff has made- see, the argument here is whether or not these questions are antecedent to there being an agreement or they arise after there is an agreement. It is stipulated in this case that there is a contract between Sheridan-Geller and Uber. There's offer, there was acceptance, and there was consideration. So there is a contract. The question about arbitrability is whether or not- arises once you start construing the text of the agreement. And as soon as you get into the four corners of the document, the delegation clause applies. It's not that you do the arbitrability clause and then look at delegation. As soon as you start construing the language in the agreement- But counsel, doesn't the underlying cause of the dispute have- has to have its genesis in some activity between the contractor and the contractee? And what is that in this case? Your Honor, if you're positing that there is a public policy prohibition against agreements to arbitrate that don't have that nexus you're describing, that rule would be preempted by the Federal Arbitration Act. That is exactly the kind of argument that both in Kindred Nursing and in Marmot Health Care Center, both of which are binding authorities. I don't think we're disputing that the United States Supreme Court has, under the Supremacy Clause, its decisions prevail here. Under both of those decisions, you now have a preempted rule of Illinois state contract law. So the point here is simply, and again, if you look at the delegating language in this agreement that necessarily applies as soon as you're construing the agreement. It says, you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to these terms and prior versions of these terms or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof, will be addressed by the arbitrator. Then you get to the choice of law section. Well, but let's finish up that. I mean, really, what this is about is an incident or accident resulting in personal injury that you allege occurred in connection with your use of the services. You're being Sheridan. So that would be such a – You're being Sheridan in the use of services. So, Your Honor, and obviously, we have not made our full – So let me ask you this. Let me ask you the same extreme example that I asked Mr. Haskins, that Uber in this instance invoked an arbitration clause in Sheridan's contract with Lyft, your competitor. Clearly a wholly groundless objection, right? It's clearly wholly groundless. But you're saying that Shine requires that we send that to the arbitrator to decide? No, Your Honor. Okay, so where do you draw the line? All right. Offer, acceptance, consideration. We're not talking about formation of contract here. Oh, but I disagree. In the Lyft hypothetical you're discussing, the plaintiff's argument would be, I never formed a contract with Uber. I formed a contract with Lyft. The parties to the agreement are myself and Lyft, not myself and Uber. So Uber, unless it wanted to try and come up with some sort of third-party beneficiary argument, which I think would – So is that a question of validity you're saying? No, that's a question of contract formation. And, again, I go back to Renaissance versus Jackson, which is the foundation of all of this, which defines validity in terms of formation. Now, you may have a valid contract that is not enforceable as a matter of public policy, as long as it's a generally applicable contract defense like fraud, duress, and consonability. It can't draw its meaning from the fact that it's an agreement to arbitrate. But in that – your hypothetical, Your Honor, I think that that would be an issue for the court because you wouldn't have a validly formed contract as the antecedent question in the case. Now – But why would the contract not be valid between Sheridan and Lyft? It would not be as valid as between Sheridan and Uber in that circumstance. That would be my point. You wouldn't have a formed contract between the parties, but you have that hue. And I think to the extent what plaintiff is really positing here, and it's a little bit difficult to sort of suss out, but to the extent what plaintiff is positing here is that as a matter of Illinois wrongful death law, she is not able to enter into an agreement to arbitrate her claim for wrongful death. I think that doesn't really pass the straight face test, and she's a particularly poor individual to make that argument. Go back and look at the wrongful death statute itself. The first sentence of it says that claims brought in this are brought in the name of the personal representative of – and it's not the estate. That's the survival claims. It's of the beneficiaries to the – the statutory beneficiaries to the claim. I disagree with counsel. Sheridan Geller versus Uber is the correct caption for the claim for wrongful death. It's not for the survival claims. I absolutely believe that. And bear in mind, so far as the record shows here, Sheridan Geller is the only beneficiary here, a statutory beneficiary. So this is a claim of Sheridan Geller on behalf of Sheridan Geller versus Uber. And her position is Sheridan Geller's contractual agreements cannot be applied to Sheridan Geller or Sheridan Geller. That's sort of beggar's belief here. We know from wrongful death law that she controls the claim. She gets to decide where to file it, who to retain as counsel to pursue it, whether or not to settle. And so her position to this court is I can do all of those things, but I am not legally empowered to enter into an agreement to arbitrate because neither Sheridan – in either capacity. I can see an argument for how the contractual agreement to enter into arbitration could run either to the beneficiary or to the plaintiff designated by the statute. The beneficiary would probably be more consistent with Carter in the sense that Carter talks about the contractual obligation running to the estate, to the decedent. I could also see an argument for that ability to bind running to the state representative. Again, I think that's more consistent with wrongful death law. Counsel, would you walk us through, in your opinion, where we start here? I asked previously questions about who decides whether or not this should go to arbitration, and it seems to me that that's where we start. And, of course, opposing counsel is saying no, you have to look at the validity first, and then you get to that question. What's your opinion on that? I think that is really the helpful framework here, and I appreciate the question. And also it relates, I think, to Justice Taylor, your question. The threshold question for a court in any of these cases, and this all follows directly from the precedent of the Supreme Court, was there a contract between the putative plaintiff and the defendant? You ask the question, was there an offer? Was there acceptance? Was there consideration? At that point, you have a validly formed contract. Does it have an arbitration clause in it? This unquestionably does. And then you ask the second question, and I'm really using the framework from the Fifth Circuit in the case that plaintiff relies upon here, which is, is there a delegation clause? Because as soon as you conclude that you have entered into an agreement that has a delegation clause that decides the who decides principle to an arbitrator, then at that point, all the work of the court is is to enforce the delegation clause, and then the arbitrator is free to say, I reject the argument that this is within the scope of the arbitration clause. And then how do you square that with the Coinbase case? The court says a delegation clause does not negate a court's authority to consider the challenge to the validity of the arbitration clause, and in fact, a court must consider the challenge before ordering compliance with the delegation clause. So, Your Honor, let me offer two answers to that question. The first is that that is what the court seems to be referencing there would be a challenge to validity, but not a challenge to arbitrability, a scope question when you get into the agreement. So just from the start, the vast majority of the arguments you've heard about how this particular claim is not within the scope of the agreement, those would not, under that provision of Coinbase, would not be for court. They would clearly still remain with the arbitrator. The validity argument that they've made is an unconscionability argument, and I think Coinbase can be read in one of two ways. One is to say that general attacks on agreements based upon arguments like unconscionability can be heard by a court pursuant to that validity language, Justice Taylor, that you were referring to. I think that would effectively overrule Rent-A-Center v. Jackson. The Supreme Court has not overruled it. Normally, the Supreme Court says when it's ratcheting back. And that section of Coinbase in particular cites, I think, no fewer than five times Rent-A-Center purporting to apply it. I think the better reading of Coinbase is that that was a case involving two competing contracts, two competing arbitration agreements. And so the court really had to address which of the two contracts the claim fell under and whether or not that contract was enforceable. But if you get to the unconscionability argument, I think this strikes me as still a pretty easy case. I mean, these terms of use, exactly like these, have been affirmed against unconscionability challenges literally thousands of times. There's a – So at what point in our analysis do we get to Section 2 of the FAA and the language of controversy arising out of such contract? Do we ever reach that point? So, Justice Neville – excuse me, Chief Justice Neville, I think there are – the Section 2 statutory question, this is, I think, derived from the New Prime argument case that the plaintiffs invoke in their case. Let me start with New Prime as a very different case. There was a categorical – there's a categorical statutory exclusion in the Federal Arbitration Act for certain types of employment agreements. That's really a core statutory coverage argument. And so what the court said is that sort of statutory screen-out provision, that is one for courts to enforce. That would also, I think, apply to the provision referenced in the Women's Bar Association brief for sexual assault and sexual harassment claims. But if you start applying the arising out of language, you effectively have overturned Renaissance and you've effectively overturned Schein. If you're saying, well, the threshold inquiry is whether or not the claim is arbitrable. And unless we conclude it's arbitrable, we will not delegate the arbitrability argument to the arbitrator. That doesn't make a lot of sense. I think the better way to think about it is that if you have a contract that has a delegation clause, the dispute about arbitrability, whether it's within the scope of that clause or not, unquestionably arises out of the contract. It arises out of the arbitration clause. And that delegation issue is then referred to the court or, excuse me, to the arbitrator in the first instance. So you're essentially arguing that anything she's involved in, if she sues Uber, then she's locked into the terms of this arbitration agreement. Chief Justice McGill, my position is far narrower than that. My position is that if she sues Uber, then the question of who decides arrives and the decision-maker will be the arbitrator. And if the arbitrator – and just I will note, and if you go look at Henry Schein, there is a remedy for her if she disagrees with that ruling from the arbitrator, and it's in Section 10 of the Federal Arbitration Act, which says if after the arbitration is complete, just as would be true in a trial court if you have a final judgment, if after the arbitration is complete, she wishes to move to vacate the arbitration result because the arbitrator acted without authority, the statute does provide for judicial review that permits her to get a back-end review of that question. The question is just at the threshold. Who is going to make that decision? I'm not saying she's going to be locked into her – to arbitrate the merits of her wrongful death claim in arbitration. I'm saying the decision there, at least in the first instance, will be made by an arbitrator and not a court. That's the narrow point of issue – narrow issue that is before the court. That is the narrow issue that the appellate court correctly resolved, and we would therefore urge that this court affirm. If there are further questions, I'm happy to rest on my briefs. Mr. Berulo, thank you for your argument. Thank you. Mr. Haskins. Thank you very much. I'm going to pick off kind of where we left off there. There is absolutely nothing narrow about the appellate court's ruling in Gettler, and it is absolutely in need of this court's correction or addressing it. So thank you for accepting our appeal. Mr. Huber just told this court that it would be proper to bring this case, just the wrongful death case, as Sheridan-Gettler v. Huber. That would be proper. The Illinois Wrongful Death Act specifically says, every such action shall be brought by and in the names of personal representatives of such deceased persons. So what Huber just proposed would be absolutely abhorrent to the Illinois Wrongful Death Act. That's why, if you don't want to go open a probate estate, you have to go get a special representative. That allows you to bring just the wrongful death case and not pay a non-insurgent. So there was a statement, which was kind of where I left off in my argument, on the terrible results that could come from the appellate court decision. So we got through, if I couldn't bring this case to Sheridan-Gettler individually, and Carter says that as the representative, she's merely a nominal party. The Gettler appellate court doesn't say this, but the implication is that she's the party to this case because she's the beneficiary. And there's a truth to this case that Sheridan-Gettler and Mark were married. They didn't have children. If Sheridan owns this case individually because she's the only beneficiary, does that mean that this case comes out differently if they had three kids? If they had three kids who didn't have Huber, if the beneficiaries are the true, individually the plaintiffs, well, if there's four of them, which one? So that goes back to, is she the individual plaintiff because she's the administrator or beneficiary? Because if there's four of them, are they all individually plaintiffs? What if two of them have Huber apps and two of them don't? Gettler doesn't answer the question, are we claim splitting now? Are we sending two of them that have absolutely, that don't have an agreement, that have absolutely, there's no argument that they consented to arbitrate anything, we're going to send them to trial court, but the other two are going to go to arbitration? Counsel, is it accurate to say that your client concedes that she entered into an arbitration agreement with Huber? For her own use of her app, yes. So that is accurate, and then does that agreement expressly delegate to the arbitrator exclusive authority to decide whether or not particular claims fall within the agreement scope? No. You say no? I say no. Okay, and tell me why. Because the Supreme Court has stated again and again that arbitration and delegation is a matter of consent. You have to actually look at what the parties consented to arbitrate and delegate, and everything Sheridan maybe agreed to, not waiving our uncountability arguments, but I understand, everything that is in Sheridan agreement has to do with her use of the app. Even when Huber read the agreement, they said this governs the relationship between you and Huber, he left off the word individually. They wrote that in there, and Huber admits that Sheridan, consumers like her in Illinois, cannot go back and change these terms, that Huber writes them, the appellate court called it a contract of adhesion, but said it's okay. So you're making an argument about the scope? No. No, I'm talking about the scope. The scope of the argument means that you fit into the argument? No, no. When I say that, I ask you the question whether or not particular claims fall within the agreement's scope, and so you're saying because this is a claim that is wholly unrelated to any activity she had with Huber, it doesn't apply. I'm saying that there is no valid agreement between Sheridan and Huber for Mark's use of the app. There is no agreement for that. There is no agreement for this controversy presented before this court. Do you acknowledge Mr. Berlow's point that ultimately you can get judicial review of this arbitrability issue under Section 10 of the Act? So there is a section in the Act that allows for, after you go through a full arbitration with an award, potentially years of something that our clients never consented to, could there be back-end review? I don't exactly, to be candid with you, know exactly how that works. I don't know if it, I can't think of a case where it's ever actually happened. But the problem, so acknowledging your questions, is that there? I think it's there. But the problem is then our clients have been forced to arbitrate something they never agreed to just for the maybe chance that they'll get a back-end review of something that should have never been before an arbitrator. That's really our problem, that consumers are going to be dragged to arbitration against the Supreme Court mandate that arbitration is a matter of consent, not coercion. So going back, would this case have been decided differently if Sheridan had agreed to it? What if this was a parent who had died and left four children, some of which had an Uber app, some of which didn't? And then, so again, this question with just the Geller argument right now, there's going to be cases flying up to the Supreme Court with all these factual scenarios where the appellate court's having no idea what to do with them. Are people who never had an Uber app because they're a brother of someone who did going to be compelled to arbitration too? Is that within the scope of an agreement? And the back-end, the last part, that's an absurd result, by the way. And the back-end of that is what it's going to result in is administrator shopping. Find an administrator who doesn't have an Uber app and make them the administrator of an estate. What happens tomorrow if I go sub-Sheridan Geller out and make CIDC bank the administrator of this estate? Sheridan's a strong woman, and she wanted to see this through when the appellate court came, but what if we did? Does CIDC have an agreement with Uber? If CIDC has an agreement with Uber, does their corporate account now bind the entire estate? What if I went down the street right now and said, Sir, do you have an Uber agreement? Do you have an Uber agreement? And find someone who says no and say, Hi, great. Would you like to be the plaintiff of all the estates, the administrator of all the estates for everyone? That's an absurd result to go administrator shopping, to force families to give up administration of their own estates because someone else used an app and they also happened to have it. That cannot stand in order. For all these reasons, Your Honor, we ask that you reverse the appellate court's decision in Uber, reinstate or affirm the trial court and send this case back to the trial court for further proceedings. Thank you very much for your time. I'll share any further questions. Thank you, Mr. Haskins, for your argument. Case number 132066, Geller v. Uber Technologies, Inc. is taken under advisement as agenda number seven. Mr. Haskins, Mr. Berlow, the court thanks you for your argument.